## Louisville Times Co. v. Lyttle.

(Decided Nov. 15, 1934.)

PETER, LEE, TABB, KRIEGER & HEYBURN, MURRAY L. BROWN and H. H. OWENS for appellant.

RAY C. LEWIS, J. B. WALL and F. P. STIVERS for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On April 20, 1932, the Courier-Journal, a newspaper owned, issued and published by the appellant and defendant below, the Louisville Times Company, a corporation, printed in its issue of that day an Associated Press dispatch emanating from the branch office of the latter in Frankfort, Ky. For years prior thereto one of the most noted Kentucky feuds, known as the "White-Bailey feud," had its existence and chief seat of operation in Clay county. During its existence a number of the Whites, and as many or more of the Baileys, were assassinated. A short while prior to the publication of the dispatch referred to there occurred what was supposed to be a fresh breaking out of the feud, although the original leaders of the two factions had become largely depleted. The latter occurrences were the assassinating of a colored man named Neal, who was a witness in some criminal prosecution, upon the streets of. Manchester, and shortly following it the assassination of Police Judge Stivers upon the same spot where Neal had received the same treatment. Frank Baker, an attorney at Manchester, was commonwealth's attorney of the judicial district including Clay county, and he and his brother, who was the county attorney of Laurel county, also in that judicial district, came to Frankfort to induce the Governor of the commonwealth to send troops to Manchester to protect the

court and its grand jury in the investigation of such acts of lawlessness. While in Frankfort the commonwealth's attorney, Frank Baker (also referred to as F. H. Baker), gave to the representative of the local branch of the Associated Press the substance of the publication, which latter was and is in these words:

"Frankfort, Ky.—April, 19th, Governor Ruby Laffoon declined today to consider a request that troops be assigned to Manchester, Clay County, Kentucky, pending an investigation of recent slayings unless the Sheriff and the Circuit Judge of the District join in the request. F. H. Baker, London, Commonwealth's Attorney, and his brother, B. B. Baker, Manchester's County Attorney, who made the request for troops here today after relating conditions of alleged lawlessness in the community, said they were able to obtain the recommendation of the Sheriff, G. L. Langdon, but that Circuit Judge W. M. Lewis, was unwilling to recommend that troops be called out.

"After an audience with Governor Laffoon, the Baker brothers conferred with Judge Lewis, who was at the Capitol to argue a civil case before the Court of Appeals. They said Judge Lewis informed them he did not believe troops would help the situation. Judge Lewis, also told Adjt. Gen. Henry H. Denhardt, that he did not believe the situation warranted the sending of soldiers to the Southeastern Mountain County. The Baker Brothers, then stated they had abandoned their efforts to have troops assigned to the county and that they would return to Manchester immediately and resume their efforts to investigate alleged lawlessness despite a warning from their friends their lives would be endangered.

"Meanwhile warrants were issued at Manchester by County Judge J. M. Lyttle, for Tom and Oakley Baker, in connection with the assassination of Police Judge C. P. Stivers, on Main Street, in Manchester Saturday. Judge Lyttle said one of the warrants were forwarded to Jackson county and the other to the Sheriff of Madison county for service. At the Clay County jail eleven guards were assigned to protect Frank McDaniels, 24 years old, of Burning Springs, and John M. Quinn, 50, Manchester Attorney, held in connection with the Stivers killing, McDaniels was charged with murder and Quinn with conspiracy.

"Commonwealth's Attorney, Baker, and County Attorney Baker, said factional feeling was so tense in Manchester, that the opening of Clay Circuit Court scheduled for yesterday, had been deferred. They said T. H. Webb, London, who had been appointed to sit as Special Judge in the absence of Judge Lewis, had declined to open court, after looking over the situation. R. W. House, Manchester Attorney, was designated today by Chief Justice Richard P. Dietzman, of the Court of Appeals, to substitute for Mr. Webb, as Special Judge of the Clay Circuit Court. Mr. House is expected to open Court tomorrow.

"The Commonwealth's Attorney said he planned on his return to Manchester to press for a grand jury investigation of the killing of Alf Neal, negro, last February, and the killing of Jim Bailey, about three years ago. Judge Stivers had appeared as a witness before the Grand Jury in the shooting of Neal but the Grand Jury returned no indictment. He was shot exactly on the spot where Neal was slain. The Commonwealth's Attorney said an indictment against County Judge Lyttle, in connection with the death of Bailey had been quashed.

"Adjutant General Denhardt, said he was informed that factional feeling brought to a high pitch by the killing of Judge Stivers, dated back to feud days more than thirty years ago. Factions in the present controversy, General Denhardt said he was told, had been identified with the Baker-Howard-White-Philpot-Feud. General Denhardt said an uncle of the Baker Brothers was shot to death in Manchester about twenty-five years ago, after State Troops had been assigned there to restore order."

On May 30 thereafter the appellee and plaintiff below, J. M. Lyttle, who was then the county judge of Clay county, and had been for seven years, as well as then a candidate for a third term, filed this ordinary action in the Clay circuit court against defendant to recover $70,000 damages against it for libeling him, which he averred was contained in this paragraph of the publication: "The Commonwealth's Attorney said an indictment against County Judge Lyttle, in connection with the death of Bailey had been quashed." No other item in the publication was complained of, and it was alleged that plaintiff was never indicted in connection with the death of Jim Bailey (elsewhere referred

to in the publication) nor, of course, had any such indictments been quashed and that by reason of such false publication plaintiff had suffered humiliation, mental pain and anguish, loss of reputation, and otherwise damaged in the sum of $50,000, and that he was entitled to recover, in addition thereto, the sum of $25,000 as punitive or vindictive damages, and he prayed judgment against defendant for the aggregate of those amounts.

Before answering, the defendant filed its petition with the necessary affidavits and moved the court for a change of venue, upon the trial of which evidence was heard, and which was transcribed and brought to this court as a part of this record; but at the close thereof the motion was overruled with exceptions, and the alleged error of the court in doing so is one of the grounds urged for reversal. After the filing of demurrers, motions to strike, etc., the defendant answered, denying the material averments of the petition, except the fact of publication which was admitted. It also pleaded special privilege arising from the circumstances under which the publication was made, which were also alleged, and that defendant acted in good faith and without malice. Another paragraph alleged that the "Bailey" referred to in the libelous article was in reality Bev Bailey, a brother to the Jim Bailey referred to therein, the former of whom was assassinated by members of the White feud in Clay county some years ago, and that plaintiff participated and aided and abetted therein, and that he was actually guilty of participating in the killing of Bev Bailey, the one intended to be referred to in the article, and for which reason he was subject to be indicted, but which was not done. That allegation, we think, was properly stricken from the answer, since it could scarcely be held competent for defendant to reform the libelous publication and then rely on the truth of it as reformed. A reply completed the issues, followed by a trial resulting in a verdict in favor of plaintiff against defendant for the sum of $10,000, for which judgment was rendered, and, defendant's motion for a new trial having been overruled, it prosecutes this appeal, relying upon a number of grounds in its motion for a new trial as alleged errors; but, as we appraise them, it will only be necessary to consider (1) error of the court in overruling defendant's motion for a change of venue; (2) the contention that the publication was specially or qualifiedly privileg-

ed; (3) alleged error of the court in rejecting testimony offered by defendant; (4) error in the instructions given to the jury; and (5) excessive verdict, each of which will be determined in the order named.

1. Regardless of what may have been the rule at common law, we now have two statutes prescribing the grounds for obtaining a change of venue in a civil case, and for like relief in a criminal prosecution. The former is contained in section 1094 of our present Statutes, and the latter in its section 1109, and they are substantially the same. Such a change is authorized by the first mentioned section (applicable to this case) "when it appears that, owing to the undue influence of his (movant's) adversary in the county, or to the odium which attends himself, or his cause of action or defense, he can not have a fair trial." Other sections following each of the ones mentioned prescribe the practice, which was duly followed in this case, and our weighing of the testimony heard upon the motion herein convinces us that the court erred in refusing to sustain it and in not ordering the trial of the action in some other county free from the influences disclosed by that testimony. We are aware that in a great number of cases, many of which are cited by counsel for defendant in their brief, we have said that the circuit court upon the hearing of such a motion is vested with a sound discretion and that its ruling thereon "will be reviewed only for abuse" of that discretion. Drake v. Holbrook, 82 S. W. 297, 28 Ky. Law Rep. 1319. We could increase the number of cases wherein that rule has been followed so as to exhibit a long list of them, but the rule is so thoroughly established as to be accepted without dispute, and which we now reaffirm as the correct one.

That interpretative rule prevails in civil causes as well as criminal prosecutions in both of which we construed the two sections of the statute, supra, as meaning substantially the same and which is evidenced by our constant citation of prior opinions dealing with the subject and which belong to the opposite class to the one being dealt with. So that our opinions in either class of cases are applicable to like procedures in the other one. However, we have, perhaps, declined to interfere with the court's ruling on such motions more frequently than we have reversed its action in overruling them; the ratio, perhaps, being about 60 per cent. of affirmances of the court's order in overruling the motion,

with 40 per cent. of reversals of them. But, however that may be, the applicable statute enacts, in express and unambiguous terms, the right of a litigant to obtain a change of venue whenever it is reasonably made to appear that for any of the causes stated therein "he can not have a fair trial." The petition in this case not only alleged the long existence in the county of the feud referred to, but it was also made to appear that the plaintiff and his family were members of, or at least sympathizers with, the White faction, to which family he was related, and that the author of the libelous article (Frank Baker) and members of his family were aligned with, or in sympathy with, the Bailey faction. It also appeared by an amended petition and motion that since filing the original one Frank Baker was assassinated upon the streets of Manchester presumptively by some member or members of the opposite faction composing the feud, and that troops had to be and were sent to Manchester to restore and preserve law and order so that living conditions could prevail and the court could be conducted in decency and in order and free from factional or mob molestation. It was also alleged in the petition for the removal and shown by the testimony that plaintiff was related by blood or marriage (he having married a White) to practically all of the most prominent families then residing in Clay county, and whose ancestors for generations back had been people of high local standing and dominating influence. Their names are set out in the petition, many of whom were prominent in business affairs and commercial pursuits, while others occupied worthy positions in the legal profession, and one of whom was a politician of note and represented his district in the Congress of the United States.

Plaintiff introduced on the hearing of the motion, in addition to himself, four witnesses, who were Dr. Jones, Dr. Anderson, Sheriff Langdon, and William Marcum, a prominent banker in Manchester. The testimony of all of them was largely directed to proving that there was no bias against the defendant or its newspaper in which the complained of article was published, and in proving that in certain parts of Clay county plaintiff had no relatives, and that, if the jury should be obtained from such territories, none of its members would be related to him, although plaintiff himself stated that the average jury of twelve selected

in the county would, perhaps, contain as many as three of his relatives. He was proven to be exceedingly popular personally with the voters and those eligible for jury service in his county, and of course it would follow that such friendly sentiment for him would be accompanied with a corresponding bias against Frank Baker, the alleged author of the libel, and which conclusion is emphasized by the fact that he was assassinated after he gave it to the Associated Press, and before the trial of this case began. In addition to what we have said, it also appeared that the deputy circuit court clerk, who was in reality the actual clerk (since the chief one was confined to his bed as an invalid) was the brother-in-law of plaintiff, his wife being plaintiff's sister, and she is the official stenographer of the court; also that another relative was the police judge of the city of Manchester, and still another one was the editor and publisher of the only paper published in the county.

The witness, Dr. Jones, whose testimony is illustrative of that given by the other witnesses introduced on the hearing of the motion, testified that because of the factional and feud troubles prevailing in the county as augmented by recent occurrences, the jury might be influenced in its verdict, and that there was "a great deal of factional feeling" in the county, and that jurors from the faction with which plaintiff was allied, or with which he was in sympathy, "would favor Lyttle before anything that Baker should say"—meaning Frank Baker. The witness was asked and answered:

"If the testimony in this case should depend on some statement made by Frank Baker, do you think the fact of the recent trouble here would make any difference in trial of this case? A. Well I do not know.

"Q. Isn't there some doubt about it? A. There might be.

"Q. Frank Baker, the day before Court convened here was killed? A. Yes sir.

"Q. And there had been trouble here prior to that time? A. Yes sir.

"Q. And don't you know that there is a great deal of factional feeling? A. Yes sir.

"Q. And that the county is practically divided into two classes or factions and very strong factions? A. Yes sir."

We deem it unnecessary to incumber the opinion with a more detailed statement of the testimony or its substance heard upon the trial of the motion, since we interpret it to plainly manifest a condition of affairs existing in Clay county at the time of the trial of the motion that would prevent defendant from having a fair trial between it and plaintiff, its adversary. The good faith of defendant in publishing the article and upon which it relied and which it was entitled to prove in mitigation of damages was in some degree to be measured by the standing of Frank Baker with the jury trying the case, since he was the author of the publication and in whom the Associated Press, as well as defendant, placed confidence; but, from what we have recited of the testimony, it is perfectly clear that it was extremely doubtful if a jury could be obtained possessing no bias or prejudice against him, or one that did not contain some members in sympathy with and favoring plaintiff in his cause of action. But, whether true or not, the record made by the trial of the motion, to say the least of it, produces a situation where it was and is extremley doubtful if defendant could have a fair trial under the existing conditions, and the purpose of the statute was to relieve against such possibility when the facts are made to so clearly appear. As said in the case of Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176, 179, the underlying principle of such provisions "is that both the commonwealth and the accused are entitled to a fair and impartial trial by a jury free from any personal or political (and we might inject 'factional') influences that might bias them in deciding the case, or that might prejudice their minds for or against one of the parties. * * * And when it appears that either party cannot have, in the county where the crime under investigation was committed, this character of trial, the prosecution should be removed to some other convenient county, where a jury can be secured that will be entirely free from partiality or prejudice for or against either of the parties."

The opinion refers to the feelings, impulses, and inclinations of human nature, and determined that the therein manifested condition of affairs, somewhat analogous to those portrayed in this case, authorized the change of venue in that case, and which we think is eminently applicable here. See, also, the cases of Wallace v. Commonwealth, 167 Ky. 277, 180 S. W. 381;

Keeling v. Commonwealth, 178 Ky. 624, 199 S. W. 789; and Bradley v. Commonwealth, 204 Ky. 635, 265 S. W. 291. Also the civil cases of Asher v. Beckner, 41 S. W. 35, 19 Ky. Law Rep. 521, on page 537; Middlesboro Waterworks v. Neal, 105 Ky. 586, 49 S. W. 428, 20 Ky. Law Rep. 1403; and Wall v. Muster's Ex'rs, 63 S. W. 432, 23 Ky. Law Rep. 556.

We will not lengthen the opinion by a recitation of the facts appearing in either of those civil cases, but will refer the reader to those opinions for that information. Suffice it to say that we are convinced that this record overwhelmingly establishes the fact that plaintiff is a most prominent and influential man in his county, with loyal sympathetic friends and relatives scattered throughout its domain, as well as factional sympathizers interspersed all over its territory whereby it would be practically impossible to procure a jury of totally unbiased feelings in the trial of this action, in which he is the only prospective beneficiary. The question for determination on such hearings is not confined to a showing of absence of bias against the movant, but it also comprehends the presence of influencing sympathy and favoritism towards his adversary among those eligible for jury service.

2. In the law of libel and slander, the doctrine of qualified or special privilege is said to exist when the libel or slander is made in good faith without actual malice, with reasonable or probable grounds to believe it to be true, and "upon a subject matter in which the author of the communication has an interest, or in reference to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty." 26 C. J. 1241. The text in 17 R. C. L. 341, sec. 88, and page 427, sec. 186, is to the same effect, and which is in accord with the universally declared rule on the subject. But no text, nor any opinion of this court, so far as we are aware, enlarges that rule in behalf of a publisher of a newspaper so as to entitle it to rely on the doctrine of special or qualified privilege in any case wherein an individual could not do so; for, as said in the same volume of C. J. 1271, sec. 261, "it is well settled that in the absence of a statute (and we have none) newspapers as such have no peculiar privilege, but are liable for what they publish in the same manner as the rest of the community, and this whether

the publication is in the form of an item of news, and advertisement or correspondence. Defamatory matter published in good faith in the honest belief in its truth, if false is not privileged because published as a mere matter of news." There is nothing in the publication complained of in this case taking it out of that rule, or which possesses any of the elements necessary to create the right./ Supporting the inserted text are our domestic cases of Commercial Tribune Publishing Co. v. Haines, 228 Ky. 483, 15 S. W. (2d) 306; Democrat Publishing Co. v. Harvey, 181 Ky. 730, 205 S. W. 908, and others referred to in those opinions. We therefore conclude that the publication in this case was not specially privileged, the only effect of which, however, would have been, if true, to destroy the presumption of malice and to place on plaintiff the burden to prove express malice.

3. The rejected testimony as a basis for ground 3 was that offered by defendant to sustain the eliminated parts of the answer, supra, by proving general circulated rumors to the effect that plaintiff was actually guilty of participating in the slaying of Bev Bailey, and also showing by eyewitnesses that they saw him so engaged, and that they so testified before the grand jury, but which returned no indictment. Defendant also offered to prove by other eyewitnesses to the killing of Bev Bailey facts connecting plaintiff therewith, but who did not appear before the grand jury in the investigation of the charge. If the published article by defendant had referred to plaintiff as participating in the killing of "Bev Bailey" instead of "Jim Bailey," the offered testimony might have been relevant to the extent at least of mitigating the damages sustained by plaintiff because of its publication; but whether in that event the offered testimony would or not be admissible to prove the truth of the charge, i. e., that an indictment had been returned against plaintiff, which is admittedly untrue, is a question that is not presented and upon which we express no opinion. We are convinced that none of the offered testimony referred to was competent in this case, since the publication complained of referred to the homicide of a totally different individual from the one concerning whom the offered testimony related, and, as we have pointed out, it may not be reformed so as to render the offered testimony competent for any purpose.

4. The court gave to the jury six instructions, and a seventh authorized a verdict by nine or more of its members. The first instruction directed a verdict for plaintiff, unless the jury believed from the evidence "that all of the charges contained in the publication complained of in the petition are in fact or in substance proven to be true as published." The error in that instruction consists in requiring the defendant to prove the truth of every statement contained in the printed article, when only that part of it above referred to is complained of in the petition. The instruction should have been confined to it alone instead of embracing every other one which the publication contained. Instruction No. 2 properly submitted the measure of plaintiff's actual damages, while No. 3 authorized a verdict for defendant, but only upon condition "that the whole publication complained of" was true, when for the reason just stated it should have been confined to the single statement containing the libelous matter. The same criticism is to be applied to instruction No. 4 containing the same vice. Instruction No. 5 attempts to define "compensatory damages," which is stated therein to be "an adequate equivalent of the loss or injury sustained by him, if any, by the publication complained of, in other words, as would pay him for his loss." We do not think any such instruction necessary in view of instruction No. 2 which substantially covers the ground relating to compensatory damages, nor do we think the definition of compensatory damages necessary in view of instruction No. 2, which we approve, and it (No. 5) will be omitted on another trial. In all other respects we discover no error in the instructions as given by the court, which, when corrected as herein indicated, will properly submit to the jury the rights of each party in this litigation.

5. In actions of this kind three classes of damages may be recovered if the facts are such as to fasten liability on defendant. They are: (a) General damages; (b) special damages; and, where express malice is proven, (c) exemplary or punitive damages. Neither of the latter two classes is shown or authorized in this case, nor did the court submit to the jury any relief except the recovery of general damages, and which we think was proper. The testimony tended to show that the publication if it affected plaintiff's reputation at all had the effect of cementing the support of his friends

144

rather than to separate them from him. There is no proof that any reader of the article or any one who heard of it believed the truth of what it contained. But, notwithstanding such condition of the proof, at least some general damages are presumed to flow from such a false publication, and there is no accurate rule for measuring the amount of recovery. Each case must therefore be determined largely upon its own facts. We could review the testimony and, as we think, clearly point out that the verdict was and is flagrantly excessive in amount, but, because the judgment must be reversed for the reasons hereinbefore stated, we will not assume that task at this time, since the same error might not occur upon another trial.

For the reasons stated, the judgment is reversed, with directions to set it aside and to sustain the motion for a change of venue, and for other proceedings consistent with this opinion.

The whole court sitting.