## Begley v. Louisville Times Co., Inc.

(Decided March 25, 1938.)

WM. LEWIS & SON, A. T. W. MANNING and SYLVESTER V. LITTLE for appellant.

H. H. OWENS, J. B. JOHNSON, PETER, HAYBURN, MARSHALL & WYATT and WILSON W. WYATT for appellee.

Opinion of the Court by Morris, Commissioner—Affirming.

This is an appeal from a judgment of the Whitley circuit court, rendered upon a verdict of a jury in favor of appellee in conformity with a peremptory instruction, directed by the court after appellant had introduced testimony. It is insisted by appellant that the court committed error prejudicial to his rights in so directing the jury. Appellee contends to the contrary.

Appellee, admittedly, publishes and circulates "The Courier Journal," and on February 14, 1935, it

published and circulated in the various counties of the state, and in the counties of Laurel, Clay, and Jackson, its edition of that date. At the time of the publication appellant was the circuit judge of the Twenty-seventh judicial district of Kentucky, composed of the three counties named, his place of residence being London, Laurel county.

By petition filed December 21, 1935, and a later amendment, it was alleged that appellee had willfully, falsely, and maliciously published, circulated, and caused to be distributed the issue mentioned above, containing certain libelous statements concerning plaintiff.

The article as published covered an entire page of the paper of that date. As copied in the record, it covers thirty-five pages, and excerpts from the article cover nine pages of the petition. After a reading of the entire article, so much as is set out in petition, and in appellee's brief, we find it sufficient to quote the following extracts:

"A Court House Ring dominates Clay county. The members of this ring, when elected to office, seem to be of one accord in the thought that they were elected to office for the purpose of protecting and favoring their friends and of persecuting their enemies. This dominant office-holding group comprising such a small percentage of the population are nevertheless able to control the politics of the county by threats, intimidation, and actual violence. * * * Outlawry in Clay county, as one of the forces uesd to subjugate rivals, is encouraged by ruthless leaders, and courts, to an amazing extent, and is made the media of punishment for enemies and reward for friends.

"In an Associated News dispatch I have just read that the police in New York City had arrested 646 prisoners under a statute prohibiting any person to consort with known criminals. Most everyone it seems in Clay and adjoining counties know that certain prominent men—officials and ex-officials—possessed and were riding in stolen automobiles, which they knew were stolen, yet district, county and city officials not only consorted with these violators of the law but protected them while the courts have been used for the purpose of per-

secuting and intimidating officers who sought to enforce the law. * * *

"The Circuit Judge of the district, which includes Clay county, is Judge W. E. Begley, of Laurel county. I am informed that he was elected upon a platform pledged to law enforcement. Since his election, he has been repeatedly informed that certain prominent men, including an ex-Circuit Judge, officials of Clay county, officers of his court, and certain prominent citizens were driving automobiles known to have been stolen. He promised to do his duty in connection with this matter, yet for some unknown reason, instead of causing indictments to be returned against these known violators of the law, the only thing done by his court in connection with the automobile theft was to permit and encourage the indictment of Clyde Jones for larceny and housebreaking, and the fixing of his bond at a large sum. * * *

"It is reported that for some unknown reason Judge Begley, when organizing the last Grand Jury which indicted State Policeman Clyde Jones, but failed to indict the automobile thieves and the possessors of stolen cars, arbitrarily transferred two men who had been summoned to serve on the petit jury to the Grand Jury; one of these was made foreman and the other Clerk of the Grand Jury. It is understood that this 'switch' was made upon the suggestion of the Commonwealth's Attorney, who the evidence shows, sought the indictment of Jones and the protection of other alleged violators of the law. Many believe Judge Begley sincere and desirous of enforcing the law but apparently he is so dominated by the Commonwealth's Attorney that he finds time only to enforce minor infractions of the law while felonies remain unpunished. However, if he will not do his duty, either through political or other fear, he should either resign or be impeached. * * *"

In addition to such facts as related, the petition alleged that by the distribution of the paper containing the alleged libelous article, particularly in the county of his residence, and in the counties comprising his judicial district, he had been greatly humiliated and caused to suffer much mental anguish and embarrass-

ment. He also alleges the untruth of the statement, or such parts thereof as directly or indirectly made reference to him.

The cause, by agreement of parties, was transferred to Whitley County circuit court and all subsequent procedure was in circuit court of that county. The appellee demurred to the petition, and moved to require plaintiff to supply a copy of the newspaper containing the entire article, and to require plaintiff to separate the items of damage. The court overruled the demurrer, and the last-mentioned motion, but as far as the record shows did not pass on the second motion. The failure to do so is of no materiality.

In answer, appellee admitted the publication and distribution, but denied all other allegations, and pleaded affirmatively the following defensive matter: That it was a member of the Associated Press, and had received, in due process of distribution of news by that agency, the article which is the subject of complaint, and that in doing so it relied upon the accuracy and proven reputation of the said agency in transmitting articles or items of news to it, and newspapers throughout the country. That same was received by it through the medium stated, and it published the article in the best of faith as a proper news item, and without malice toward plaintiff, or without purpose or intent to injure him in any manner.

Appellee averred that the published article (from which excerpts were embodied in the petition) consisted of an official report made by the then Adjutant General to the Governor; that the report as published by it was filed by the Adjutant General with the Governor prior to the publication, or about February 13, 1935. Further, that it was released by the Governor to the Associated Press for the purpose of publication in various newspapers, and was a matter of public record and an official document. That prior to the publication the Adjutant General, in accordance with the law, held a court of inquiry at Frankfort; witnesses were called, testimony taken and preserved for the purpose of ascertaining the state of lawlessness in Clay county, Ky., and that the report to the Governor was the official report and opinion of the court of inquiry. It was asserted the report contained the findings of fact and good faith conclusions derived from the inquiry, and "because of

the alleged official public nature of the report, it was privileged to publish it without becoming liable therefor,'' and it pleaded the privilege in bar of appellant's right of recovery.

Appellee then pleaded that its purpose and business is ''to publish through the medium of the Courier-Journal, useful, proper and official information, including therein such items as pertain to the actions of various officials of the state, and officials generally, and the actions of such officers are matters of public, political and social interest and concern,'' and that it was privileged to publish, as it did, the report ''without malice or ill will.'' In still another paragraph it was alleged that prior to publication of the complained-of article, the Governor had ordered military officers to Clay county for the purpose of investigating alleged criminal activities and lawless conditions, with authority to hear evidence and preserve testimony for the purpose of reaching a conclusion as to the true state of affairs. This inquiry, it says, was a matter of general public concern and interest, and its result proper to be brought to the attention of the public, and that the article published was the officially communicated result of the efforts of the Adjutant General and those acting under his directions. It was also pleaded that prior to the publication of the article, appellant was notified of the report and its intentions to release it for publication, calling upon plaintiff to make a statement, if he so chose, which it agreed to publish along with the article, but received no response. Appellant filed as a part of its answer the complete article as it appeared in the paper on the date named. It was addressed to the Governor, and was signed by the Adjutant General, officially.

Appellant filed general demurrer to the answer, the court overruling same. Later appellant filed reply, which controverted the allegations of the petition. In a second paragraph it was alleged that if the Adjutant General had held a court of inquiry, or heard evidence for the purposes mentioned in the petition, it was a one-sided and not a fair investigation of such conditions. That the Adjutant General did not attempt to hold a fair investigation; did not call plaintiff, or any other person mentioned in the article, as a witness, or try to procure the testimony of persons resident in Clay county, who were familiar with existing condi-

tions, calling only witnesses who were biased or prejudiced. That no testimony taken on the hearing was preserved or filed with the Governor; that the libelous statements made in the Adjutant General's report were not borne out or supported by the evidence (if any was heard), and the report made by the named officer was made willfully and maliciously "on the part of the Adjutant General" for the purpose of slandering appellant. Then followed an allegation to the effect that while the Associated Press had communicated with appellant, and offered to publish any statement he might make, neither time nor opportunity were given for appellant to explain. The proof shows that the telegram mentioned came at the time stated to appellant's home address, but he was in Louisville. In an amended reply, appellant challenged the legal right of the Adjutant General to hold or attempt to hold the alleged court of inquiry, and the right of the Governor to authorize or direct the inquiring officer to hold or conduct such inquiry.

By agreement of parties, all untraversed pleadings were controverted of record, and thus the issues were completed. As indicated above, upon completion of proof by appellant, the court, upon motion by appellant, directed the jury to, and it did, return a verdict for defendant. Upon this verdict the court entered judgment dismissing appellant's petition. It is not shown by the judgment, nor indicated in any way, upon what grounds the court directed the verdict; whether upon the ground that the appellant had failed to show malice, or that the publication was privileged.

We need not encumber the record by setting out in detail the proof. It is sufficient to say that appellant was questioned closely, and offered other proof as to the untruth of the direct or indirect charges, and proved a good reputation both personally and officially. Other matters arising on proof, such as we conceive to be pertinent, may be discussed as we proceed to consider the legal issues involved.

Counsel for appellant begins brief with the statement: "This is a two point lawsuit:" The first, "Is the publication libelous per se?" and, second, "Is the publication complained of privileged?" We agree that, perhaps, it is a two-point lawsuit, but the dominant question is the second one stated by counsel; the other,

if it has any bearing, is whether there is any showing at all of malice by defendant in the publication of the article. We shall direct attention to the second contention, first undertaking to determine the law in regard to privileged publications.

At the outset we may say that in laying the charge it is not asserted that there was contained in the whole article any alleged objectionable comment, either by way of glaring headlines or in the leader which preceded the complete, full, and apparently unexpurgated report. So much of the petition as set up a cause of action based the cause upon excerpts taken from the complete article, such as the appellant conceived as reflecting upon him directly or indirectly; therefore, while considering that portion quoted in the petition, we must also consider the entire article, since it was voluntarily brought into proof by appellant.

The question of what is a privileged publication has been the subject of consideration by the courts of America from time of its establishment as a free government, and likewise in England long before. In the earlier days the inquiry was generally, as we read the cases, confined somewhat to what seems to have been the privilege rule, as applied to judicial or quasi judicial proceedings. The epitome of the rule is stated in Starkie on Slander and Libel, section 213, as follows:

"On the grounds of public policy, no action lies either against a judge, magistrate or person presiding in a judicial capacity, of any court or other tribunal, judicial or military, recognized by and constituted according to law, * * * for anything said or done relative to the matter in hand, in the ordinary course of a judicial proceeding, investigation or inquiry, whether civil or criminal * * * even if it be false or malicious, and without reasonable and probable cause. * * * (196) As to defamatory statements and other publications made in the course of proceedings in courts of justice, by the general policy of the law, the occasion is such that it not only repels the presumption of malice, but as appears, excludes all evidence of malice, and allows the occasion and circumstances to supply an absolute and peremptory bar to an action of slander or libel in respect of any such statements or publications."

The foregoing fairly states the rule. McLaughlin v. Cowley, 127 Mass. 316; Johnson v. Brown, 13 W. Va. 71; Runge v. Franklin, 72 Tex. 585, 10 S. W. 721, 3 L. R. A. 417, 13 Am. St. Rep. 833. These cases relate more directly to officers. of tribunals, litigant and witnesses. However, we find the rule the same when there is under consideration the plea of privilege, when such is put forward as a defense by one making publication of matters arising in executive or administrative proceedings. The rule of law relative to publications of the findings, or reports made in proceedings of the nature mentioned, is well stated in Restatement of Torts, Draft No. 13, section 1056, pp. 181-184:

> "The publication of a report of judicial proceedings or proceedings of a legislative or executive body of the United States, a State or Territory thereof, or a municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter which is false and defamatory, if it is—

> "(a) accurate and complete or a fair abridgment of such proceedings, and

> "(b) not made solely for the purpose of causing harm to the person defamed. * * *

> "a. Under the rule stated in this Section, the accurate and fair report of such proceedings are protected by a privilege which is qualified only to the extent that protection is lost if the report is published solely for the purpose of defaming the other and not for the purpose of informing the public. This privilege differs from the usual conditional privilege in that it affords protection even though the defamatory statement reported is known to be false.

> "b. The protection afforded by the privilege stated in this Section is applicable to the publication of the reports of any judicial proceeding or those of any legislative or executive body. It is thus applicable to the report of proceedings before any court of the United States, a State or Territory thereof, or a municipal corporation whether the court is one of general or of special and limited jurisdiction. It is also applicable to the report of any other proceedings, judicial in character,

although they take place before an administrative, executive, or even legislative body, as, for example, an extradition hearing before the Governor of a State of the United States or impeachment proceedings before a legislative body. * * * So, too, the rule is applicable to a report of the executive or administrative action of officials of the Nation, State, or any municipal corporation, which, as such, is subject to separate suit, and to proceedings and action of other organizations which are by law authorized to perform public duties such, for example, as a medical society or a bar association, charged with authority to license practitioners. * * *

"d. The rule stated in this Section requires the report to be accurate. It is not necessary that it be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting. It is enough that it convey to the persons who read it a substantially correct account of the proceedings.

"e. The fact that a court whose proceedings are reported did not have jurisdiction over the subject-matter or the person involved will not affect the existence of the privilege under the rule stated in this Section. This is so whether the lack of jurisdiction depends upon a constitutional or statutory provision or a rule of the common law."

As we read the foregoing rule, there seems to be no distinction as to the application of the rule, where sought to be applied when publication is of a strictly judicial or executive proceeding, and of proceedings in a body executive or administrative in nature; a quasi judicial body. However, we need say no more than that from a reading of the rule enunciated, and as laid down in cases from other jurisdictions, and our own, we are satisfied that if the publication of the full report was the result and outcome of a proceeding, executive in one part, administrative in the other, it would be entitled to the same protection, or privilege as though it were judicial. This would follow, it seems to us, even though we should be of the opinion that the inquiry which preceded and resulted in the report, followed by the publication, was not strictly of a military court, as the term is generally used, since the re-

port was one from an administrative officer to the Governor of the commonwealth in a matter of interest and consequence, not only to the Governor but to the people of the commonwealth, and related to both civil and military matters.

In the case of Tilles v. Pulitzer Pub. Co., 241 Mo. 609, 145 S. W. 1143, 1150, it appears that there was held an inquiry as to gambling, alleged to have been carried on daily at a race track near St. Louis, in open violation of the law. The Governor directed the Attorney General to look into the matter and report, for the ultimate purpose of taking steps leading to a suppression of the alleged vice. After investigation, the Attorney General made a statement, which was rather pointed and severe. Some one who was financially interested in the operations of the racing plant sued the publisher of the paper which carried the Attorney General's statement. The court found defendant's plea of privilege to be sound, saying:

> "If the law was being violated, and gambling permitted, the public had an interest in knowing the facts. If contemplated action of any kind affecting this place of public amusement was about to be taken, the public was entitled to know of such contemplated action. * * *

> "Under the evidence in this case, there had been an official investigation. Such investigation rises to the dignity of a privileged occasion, or at least a quasi privileged occasion. * * *

> "The Attorney General in the close of his testimony said that he was speaking officially, and intended that his opinion should be made public, on account of the public interest which was to be subserved. He was, in fact, expressing his opinion as to the condition and legal status of the Delmar Jockey Club and the acts of such club and of its owners. Under these circumstances, we think that there was a privilege or at least a qualified privilege in the publication of the article containing this opinion of the chief law officer of the state."

The case of Tanner v. Stevenson, 138 Ky. 578, 580, 128 S. W. 878, 881, 30 L. R. A., N. S., 200, was an action growing out of alleged libel by the writing of a critical letter by Tanner, concerning another, and involving school matters. The court there (by the late Judge

Carroll) distinguished the communication as being one of qualified, rather than absolute privilege, and in doing so called attention to the rule of defense based on absolute privilege:

"But in our opinion the law of absolute privilege cannot be invoked to protect Tanner from the consequences of this letter. The cases to which this privilege applies are few in number and ought not to be enlarged. * * * In these cases there is no penalty attached to malice or falsehood. The utmost liberty is deemed allowable, and communications that under other circumstances would be actionable are treated as permissible. But the cases to which this immunity from liability applies are confined to judicial and legislative proceedings, matters involving military affairs, and communications made in the discharge of a duty under express authority of law by or to heads of executive departments of the state."

In line with the Pulitzer Case, supra, are People's United States Bank v. Goodwin, 148 Mo. App. 364, 128 S. W. 220; McClure v. Review Pub. Co., 38 Wash. 160, 80 P. 303; Meteye v. Times-Dem. Pub. Co., 47 La. Ann. 824, 17 So. 314. See, also, texts in 17 R. C. L., secs. 76-78; Newell on Slander and Libel, 3d Ed., 495, 496; Odgers on Slander and Libel, p. 277.

A recent case in our own jurisdiction seems to be fairly conclusive of the question of privilege, as applicable to the case at bar. In McAlister & Co. v. Jenkins et al., 214 Ky. 802, 284 S. W. 88, 90, the appellees were members of the real estate board for the city of Louisville, acting under the provisions of chapter 138, Acts of 1924, by which the board was created, the act confiding in the board certain duties in regard to a regulation of the business. A complaint against appellant company was filed with the board, and appellees had conducted a hearing thereon. The board found McAlister not guilty of the preferred charges, but charged some of the company's employees with improper practices, and revoked their license. It was charged in the petition that appellees had conspired to and had made false and malicious reports about appellant for the purpose of injuring its business. Without going into detail, it is noted that this court upheld the court below in sustaining a demurrer to the peti-

tion. After quoting the law which imposed the duty upon the board, we said:

"From these provisions it is clear that the members in holding such a hearing, not only by express legislative authority are the agents of the state for that purpose, but they necessarily, in the discharge of the express duty so imposed upon them, exercise in some measure quasi judicial functions."

Referring to the cases of Tanner v. Stevenson, supra, and Sebree v. Thompson, 126 Ky. 223, 103 S. W. 374, 11 L. R. A., N. S., 723, 15 Ann. Cas. 770, in regard to the rule, we said:

"It it true that the class of absolutely privileged communications are comparatively few, and that the courts have evinced a purpose not to extend that class, and yet, in sound reason and logic, it cannot be said it should not apply to a public official upon whom there is imposed a specific duty by law to act in a given matter. The imposing of such duty presumably authorizes him to act with perfect freedom and without fear of personal consequences. If in the discharge of a duty imposed by law a public offiicial clothed with quasi judicial powers may have suspended over his head continually the threat of libel suits, it is apparent that his offiicial conduct would be tempered by and tainted with the fear that he might be unjustly. subjected to such actions. The policy of the law is therefore, and the reason of the rule is, that, although upon rare occasions judges and other public officials upon whom are imposed by law judicial or quasi judicial duties may maliciously slander or calumniate in the exercise of their authority, it is better that they should be protected upon such occasions by this absolute privilege than that the great body of such officials in the conscientious exercise of their duties should be hampered continually by the threat of such civil actions. Obviously one discharging such duties, except for such exemption, might perform them in a timid, time-serving, or inefficient manner. It is a rule therefore of public policy, not designed to protect the malicious official from the consequences of his wrongful act, but to protect the whole public

from weak and vacillating public service by those upon whom such duties are imposed by law.

"According to the English rule, the absolute privilege is more rigorously enforced than in most of the states of this country; but in Sebree v. Thompson this court, after tacitly approving the English rule, said that the absolute privilege should be restrained by some limit, and that a party or counsel in the trial of an action should not be permitted to avail himself of his situation to gratify private malice by uttering slanderous expressions against a party, witness, or third person, 'which have no relation to the cause or subject-matter of the inquiry.'

"Analyzing, therefore, the opinions in Tanner v. Stevenson and Sebree v. Thompson, we conclude that the rule in this state is that the absolute privilege applies wherever the communication is made in discharge of a duty under express authority of law by or to heads of executive departments, provided the libelous communication is pertinent to the inquiry under investigation at the time."

From a perusal of the foregoing authorities, it is evident that the publication of the report by appellee, in the form and manner as shown by appellant's proof, falls in that limited class defined as absolutely privileged. See, also, in point, Krumin v. Bruknes, 255 Ill. App. 503; Williams v. Standard-Examiner Pub. Co., 83 Utah 31, 27 P. (2d) 1; Miles v. McGrath, D. C., 4 F. Supp. 603; Samuelson v. Vinyard, 120 Or. 197, 251 P. 719; Mellon v. Brewer, 57 App. D. C. 126, 18 F. (2d) 168, 53 A. L. R. 519; Spalding v. Vilas, 161 U. S. 483, 16 S. Ct. 631, 40 L. Ed. 780.

Counsel for appellant relies on certain cases as being conclusive from his standpoint. We have examined these cases, and find that they do not reach the point involved here. None of them relate to a report made by one officer to another under authority, as will be noted upon observation. This is true of Democrat Pub. Co. v. Harvey, 181 Ky. 730, 205 S. W. 908. Here the newspaper published its own views and comments, touching certain actions of a member of the General Assembly. Its publication was not a copy of, or extracts from any official report. We held that comment on or

criticism of the conduct of a public servant are privileged, if fair and reasonable and made in good faith. We did say, and the rule is sound, that the right to comment did not embrace the right to make false statements of fact, and that malice may be presumed from the falsity of the statements. Tipton v. Rains, 228 Ky. 677, 15 S. W. (2d) 496, and Commercial Tribune Pub. Co. v. Haines, 228 Ky. 483, 15 S. W. (2d) 306, are in the class with the Harvey Case, supra, though we later held in Weinstein v. Rhorer, 240 Ky. 679, 42 S. W. (2d) 892, that while the law presumes malice if the published matter is per se libelous, a statement that a city prosecutor, and a candidate for re-election, was a "grafter" was qualifiedly privileged, and that the burden was on plaintiff to show malice. The cases cited by appellant are similar to the foregoing. The case of Louisville Times Co. v. Lyttle, 257 Ky. 132, 77 S. W. (2d) 432, is readily distinguished.

We come now to the contention of appellant that the court erred because there was a failure on the part of appellee to prove some facts alleged in its answer in respect to the acts of the Governor in ordering the military troop to Clay county; the holding of the court of inquiry by the Adjutant General; in making the report as a consequence of the inquiry, and the legal authority of the Governor to order the troops to Clay county, and the authority of the Adjutant General to hold the inquiry.

As to the authority of the Governor to send the troops to Clay county, though admittedly not requested so to do by some officer of the county vested with the power to make such a request, and the matter of failure of the officer in charge of the troops to report to some judge, or the mayor of the town, we think these two contentions are well settled in a carefully considered case, elucidated in an elaborate and unanswerable opinion. We refer to Franks v. Smith, 142 Ky. 232, 134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319, cited with approval in Middleton, Sheriff, v. Denhardt, A. G., 261 Ky. 134, 87 S. W. (2d) 139, and referred to in Sterling v. Constantin, 287 U. S. 378, 396, 53 S. Ct. 190, 77 L. Ed. 375.

As to the remaining complaints noted, we have carefully examined appellant's proof and from such examination it is evident that it was of such character

as to justify the court, as he had the right to do, to determine that the challenged article, consisting of a report from one officer to another, made in the line of duty, and under authority of law, fell into the privileged class. In 37 C. J. p. 58, it is said:

> "As a general rule if plaintiff discloses in his complaint or evidence that the communication is privileged, published on a privileged occasion, there is no need for defendant to plead privilege."

While the petition here is, perhaps, not full enough to justify the conclusion, the answer containing the entire report, and the evidence of plaintiff developed sufficient facts to authorize the court to reach the conclusion indicated by his ruling, if the dismissal was on the ground under discussion, rather than on an entire failure to show malice. For other text rules on this point reference may be had to Newell, S. & L., 3d Ed., secs. 495, 496; 36 C. J. 1221, secs. 168-173, and for case, Tanner v. Stevenson, supra.

While the inquiry held by the Adjutant General is repeatedly called a court of inquiry, the proceedings before him, as evidenced by the testimony of Carter and the two Jones, were not necessarily to be classified wholly as a technical court of inquiry. Kentucky Statutes, sec. 2711a-215. The report clearly shows on its face that it was not only a report relating to, and the result of an inquiry into the activities or nonactivities of the local troop, but was an inquiry looking to the matter of more than rumors of lawlessness prevailing in Clay county. That the Governor had the power and authority to send troops or military officers into Clay county for the latter purpose there can be no doubt. See section 81 of the Constitution; Franks v. Smith, supra. That he had authority to make inquiry into the movements, activities, or nonactivities of the militia under his command, and as chief officer, there can be no doubt; nor that there existed ample authority for the Governor's actions in regard to the matters of civil and criminal import. We do not, nor can we here inquire into motives or reasons for his conclusion and consequent acts.

It should not be overlooked that Clyde Jones, according to the proof by plaintiff, was at the time of the so-called "troop invasion," and court of inquiry, and prior thereto, under the jurisdiction of the Adjutant

General and the Governor. There was proof showing that as such officer his activities or nonactivities were legally under inspection. It is apparent from appellant's proof (the report) that soon thereafter, if not immediately, the Governor disbanded the Clay county unit. That there was a prevalence of crime (trafficking in stolen automobiles), the perpetrators going unpunished, not even apprehended, is amply shown by appellant's proof.

Without further lengthening this opinion by quoting the applicable sections of the statute which gave the Governor and the Adjutant General authority in respect to the matters discussed, we may refer to the following sections of the Kentucky Statutes under the title "Militia": sections 2711a-142, 2711a-143, 2711a-214, 2711a-215, and others.

We need not discuss the effect of the request made by the Associated Press to plaintiff to make a statement to be published along with the publication of the report. We do not treat this act on its part as furnishing defense to appellee. It is no more than a fact which to some degree might be considered as showing a lack of malice, or a manifestation of good faith.

When we consider the facts brought into proof by appellant, along with the pleadings, we are led to the conclusion that such was sufficient to uphold appellee's defense of privilege, and that the court below properly sustained the motion for a directed verdict.

Judgment affirmed. Whole court sitting.