CASE 74.—ACTION BY ADELAIDE STEVENSON AGAINST CHARLES A. TANNER.—June 7, 1910.

## Tanner v. Stevenson.

Appeal from Clark Circuit Court.

Judgment for plaintiff, defendant appeals.—Affirmed.

1   Libel and Slander—"Absolutely Privileged Communications."
    —An "absolutely privileged communication" is confined to
    communciations in judicial and legislative proceedings, and
    in matters involving military affairs, and to communications
    made in the discharge of a duty under express authority of
    law by or to heads of departments of the state.

2.  Schools and School Districts—County Superintendent of
    Schools—Duties.—The official duties of the county superin-
    tendent of schools are limited to his county, and as such
    superintendent he must look after the educational and person-
    al qualifications of persons teaching school in that county, or
    who apply to the board of which he is a member for certifi-
    cates to teach, but as to school affairs outside of his county
    he has no official duties.

3.  Libel and Slander—Privileged Communications—Qualified
    Privilege.—A letter written by the county superintendent of
    schools to the state superintendent as to an applicant for a
    state certificate is not an absolutely privileged communica-
    tion, but is qualifiedly privileged only, and he does not
    occupy in writing the letter any better position than any
    other good citizen interested in the welfare of the common
    school system, and, where he has knowledge affecting the
    moral character of an applicant for a state teacher's certifi-
    cate, he may in good faith, based on reasonable information,
    communicate what he knows to the state superintendent, and

*in so doing* he is protected, unless it can be shown that he was actuated by express malice.

4   Libel and Slander—Privileged Communications—Qualified Privilege.—Where one from malicious motives falsely attacks the character of another, he places himself beyond the protection of a qualified privilege, and, when a person publishing a libel is prompted by actual malice, the fact that the charge was believed to be true, or that it was made under circumstances that, except for the malice, would make it privileged, will not relieve him from liability.

5.  Libel and Slander— Privileged Communications— Actual Malice—Evidence—Question for Jury.—Where, in an action for libel, defendant relied on a qualified privilege, and there was evidence of actual malice, the case must be submitted to the jury.

6.  Libel and Slander—Qualified ˙ Privilege—Burden of Proof.—Where a qualified privilege is pleaded in defense of a libel, the burden of proving actual malice is on plaintiff, who must show that the publication was induced by malicious motives.

7.  Libel and Slander—Publications Libelous Per Se—Malice—Presumptions.—Where a publication is libelous per se, the law presumes malice.

8.  Libel and Slander—Falsity of Publication—Presumptions.—A plaintiff in libel need not, to defeat a plea of qualified privilege, show the falsity of the publication complained of; the law presuming that every one has a good character.

9.  Libel and Slander—Privileged Communications—Truth.—A defendant in libel, who relies on a qualified privilege, and on the truth of the libelous words complained of, may defeat a recovery by proving either that the publication was true, or that it was made without malice, and on information that he believed to be true.

10. Libel and Slander—Privileged Communications—Truth.—Where one was influenced by malice towards another in writing a libelous letter, otherwise qualifiedly privileged, he was guilty of actionable libel unless the publication was true.

PENDLETON, BUSH & BUSH, J. SMITH HAYS and TOM B. McGREGOR for appellant.

J. M. STEVENSON and F. H. HAGGARD for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This is an action for libel growing out of a letter concerning the appellee, Adelaide Stevenson, written by the appellant, Tanner, while superintendent of common schools in Clark county, to J. H. Fuqua, state superintendent of public instruction. Miss Stevenson, who had been teaching in the common schools of Clark county for several years, was examined in June, 1907, as required by law for the purpose of obtaining a certificate that would enable her to continue teaching in the public schools. At the time of her examination, the appellant, Tanner, was county superintendent of common schools, and in connection with two competent persons constituted a county board who examined applicants for certificates. This board had authority to refuse a certificate to any applicant who did not pass a satisfactory examination or who did not have a good moral character. There was also a state board of examiners of which the state superintendent of public instruction was chairman, and this board had the authority to examine applicants for teacher's certificates and to grant or refuse them for the same reasons that the county board did.

It is charged in substance in the petition that Miss Stevenson, having presented herself before the state board of examiners as an applicant for a state teacher's certificate, passed an examination that entitled her to a certificate, but that before the certificate was issued Tanner maliciously, and with the intention of injuring her and to prevent her from getting a certificate from the state board, composed and sent to Fuqua, superintendent of public instruction, the following false and scandalous letter: "You know that J. H. Thomas, with Miss Stevenson, recently stood the examination in Frankfort. In July Miss Stevenson failed in her examination here. As to Miss

Stevenson, I have heard from E. L. Butler, trustee of district No. 16 in this county, where she once taught, and G. W. Lee and L. C. Cockrill and J. I. Glover, trustees in district No. 46 in this county, and J. E. Lanter and D. M. Tanner and others whom I have not talked to recently, that she was not of a good moral character. I know nothing except what I have been told by these gentlemen as to whether this is true or not; but some of these gentlemen have volunteered this information and have said they would testify to the same if called upon at any time. In view of these facts, both as to Mr. Thomas and Miss Stevenson, I do not think a certificate should be issued to either of them, but of course I submit the matter to your judgment." In his answer, Tanner pleaded in substance that at the time he wrote the letter Miss Stevenson was a resident of Clark county, and he believed that she intended if she received the state certificate to teach in the common schools of Clark county; that he was the duly elected and acting superintendent of common schools in that county, and had received the information as to her character contained in the letter and believed it to be true; that the letter, which was mailed directly to the state superintendent of public instruction, was written in good faith in the discharge of his duties as county superintendent and without any wicked or malicious intent to injure Miss Stevenson in her good name or otherwise or to bring her into public scandal or disgrace, and with no other purpose than to acquaint the state superintendent with the information therein set out and submit the matter for his consideration. He further pleaded that, in stating in the letter that he had heard from the parties named that the plaintiff was not of good moral character,

he intended, and said letter meant simply, that this was her reputation, and what he had heard as to her reputation referred and related to her conduct with men; and that he intended to and did state that her reputation in Clark county for moral character was not good. He further charged that at the time he wrote the letter Miss Stevenson did not have in that county a good reputation for morality in her conduct with men. Upon a trial before a jury, a verdict was returned in favor of appellee, assessing the damages at $5,000. The judgment upon this verdict we are asked to reverse for errors committed in failing to properly instruct the jury.

Before coming to the legal questions involved, and to better understand the respective contentions of counsel concerning them, it will be appropriate to state briefly what the evidence conduced to show. The appellee at the time she was examined in 1907 by the county board of Clark county had a first class certificate, and under the authority of this certificate and previous like certificates had been teaching in the common schools of Clark county and at different places for a number of years. A day or so after submitting to the examination, but before receiving any certificate, she learned that she had received a second-class certificate. Being of the opinion that she was entitled to a first-class certificate, she asked superintendent Tanner to tell her in what subjects of her examination she had failed to pass, and requested permission to look over her examination papers. In reply to this request, Tanner told her in substance that she could either take the certificate that had been issued to her but not yet delivered, or stand a re-examination. The result of interviews between herself and Tanner was that she

did not accept or receive the second-class certificate, and Tanner indorsed on his records that she had been re-examined and a certificate refused.  Shortly after the matter was thus ended, she made application to the state board of examiners, of which J. H. Fuqua, as state superintendent of schools, was chairman, and there passed an examination entitling her to what is known as a "state certificate;" but before. this certificate was delivered the superintendent, of public instruction had received from Tanner the letter before mentioned, and held up the  certificate. There was also evidence to the effect that, although Miss Stevenson had not really stood an examination that entitled her to a second-class certificate, the examiners, including Tanner, had agreed to issue her one, but that before the certificate was delivered Tanner learned from reputable gentlemen living in school districts in which the appellee had taught that she was not of good moral character, and was induced by this information to decline to deliver the certificate.  In respect to the reputation of appellee for morality, there was evidence tending to prove that it was good, and also evidence conducing to show that it was bad.  To make a long story short, so far as the voluminous facts contained in the record are concerned, it is the contention of appellee, supported by some evidence, that Tanner took offense because she requested the privilege of looking at her  examination papers, and for this reason he refused to deliver to her the certificate that the board of examiners had agreed to issue.  And that, becoming more aggravated when he learned that  she  had passed a satisfactory examination before the state board, he attempted to prevent her from getting a state certificate by writing the letter to Fuqua, and

was prompted to write this letter by malice and ill will towards her. On the other hand, Tanner insists that in writing the Fuqua letter he was actuated solely by a sense of duty to the public schools, of which he was an official, and did not entertain towards Miss Stevenson any ill feeling, hatred, or malice, and in this position he is sustained by some evidence.

The first and most important legal question to be considered is: Did the Fuqua letter come within the scope of what is known in law as an "absolutely privileged communication?" If it did, then the court should have directed a verdict for Tanner notwithstanding the evidence of his malice, hatred, or ill will towards Miss Stevenson and without any regard to the motives that induced him to write the letter. If it was protected by this high privilege, it is of no account whether his motives were good or bad, or whether the matter contained in the letter was true or false. Nor could any inquiry be made into the state of feeling existing between the parties—it was all the same whether they were the best of friends or the bitterest of enemies.

In support of the proposition that the letter was absolutely privileged, the argument is made that Tanner at the time he wrote it was superintendent of common schools in Clark county, and as such superintendent was charged in an especial manner with the duty of protecting the schools from the bad influence of teachers who did not possess a good moral character, and so it was his privilege and right to place Fuqua, as superintendent of public instruction, in possession of the information he had concerning the moral character of Miss Stevenson. But in our opinion the law of absolute privilege cannot be invoked to protect Tanner from the consequences of

this letter. The cases to which this privilege applies are few in number and ought not to be enlarged. It would be a dangerous and vicious thing to license people to write and speak without any restraint. There are many evil-minded and recklessly disposed who would shelter if they could under the protection afforded by absolute privilege and give free bridle to tongue and pen to injure or destroy an enemy. It would place in the power of revengeful and unscrupulous persons the right to malign at will those who had incurred their displeasure, and allow the traducer to scatter without stint scandalous and defamatory matter about all who might come within the circle of his enmity. The law holds good character in high esteem and has made it a serious offense to wantonly assault it; but there are a few instances in which the interest of the public is esteemed more important than that of the individual, and occasions in which private rights must yield to public good. In these cases there is no penalty attached to malice or falsehood. The utmost liberty is deemed allowable, and communications that under other circumstances would be actionable are treated as permissible. But the cases to which this immunity from liability applies are confined to judicial and legislative proceedings, matters involving military affairs, and communications made in the discharge of a duty under express authority of law by or to heads of executive departments of the state. A full discussion of the principles upon which this doctrine rests, and the persons to whom it applies, may be found in Cooley on Torts, p. 210, Townsend on Slander & Libel, section 208, Newell on Slander & Libel, p. 388, 25 Cyc. p. 375, and 18 Am. & Eng. Ency. of Law, p. 1023, as well as in Morgan v. Booth,

13 Bush, 480; Gaines v. Aetna Ins. Co., 104 Ky. 695, 47 S. W. 884, 20 Ky. Law Rep. 886; Beiser v. Scripps, McR. Pub. Co., 113 Ky. 383, 68 S. W. 457, 24 Ky. Law Rep. 457; Yancey v. Com., 122 S. W. 123; Spalding v. Vilas, 161 U. S. 483, 16 Sup. Ct. 631, 40 L. Ed. 780.

Not being protected by the rule of absolute privilege, we will now proceed to consider the attitude Tanner occupied in writing this letter and the limitations that surrounded him. He did not write in obedience to any statute, for there was no statute imposing upon superintendents of county schools the duty of bringing to the notice of the state superintendent facts affecting the moral character of applicants for teachers' certificates. In respect to school affairs outside of Clark county, Tanner, as superintendent, did not occupy in writing this letter any better position than any other good citizen of the state interested in the welfare of the common school system would occupy. Tanner's official duties were limited to Clark county. Outside of that county he had no more connection with the common schools than did any other citizen of Clark county. He had the right, and it was his duty, as superintendent of common schools of that county, to carefully look after the educational as well as the moral and personal qualifications of persons who taught school in that county or who applied to the board of which he was a member for certificates to teach school. But the letter written to Fuqua had no more connection or reference to the schools in Clark county than it did to the schools of any other county in the state. Tanner, as superintendent of common schools, had as much right and liberty to write a letter to the state superintendent about an applicant for a teacher's certificate who re-

sided in any other county as he did about one who re-
sided in that county.  The application of Miss Stev-
enson to the state board did not concern the schools
of Clark county any more than it did the schools of
any other county in the state.  When he refused her
the certificate, that ended his connection in an official
capacity with Miss Stevenson, unless she again ap-
plied to him for a certificate or sought to teach school
in Clark county.  Having this view of this feature of
the case, we will treat the letter without reference to
Tanner's official position, and it is therefore not per-
tinent to the matter before us to consider with more
particularity what the privilege of Tanner as super-
intendent would be in conducting an inquiry into, or
making a statement concerning, the character of a
teacher in Clark county or an applicant for a certifi-
cate before the board of that county, or to consider
the protection afforded by the provisions of the stat-
ute relative to the powers and duties of Tanner as
superintendent in inquiring into the moral character
of applicants for certificates and his right to refuse
a certificate to any applicant not of exceptionally high
moral character.

Considering the case, then from the standpoint that
Tanner was acting merely in his capacity as a good
citizen, interested in the welfare of the public schools
of the state, let us see what his rights and privileges
were.  Upon this point we are of the opinion that he
or any other good citizen of the state who has knowl-
edge affecting the moral character of an applicant for
a teacher's certificate may in good faith, based upon
reasonable information, communicate what he knows
to the person or board to whom the application is
made or convey it to trustees who contemplate em-
ploying the person in the public schools, and in so do-

ing he will be protected unless it can be shown that he was actuated by express malice. This privilege finds ample support in the conviction that it is of the highest importance to the youth of the state who attend the public schools that their teachers shall be persons of good moral character. A person not of good moral character, holding the close and confidential relations to children that teachers do, has opportunities without number to poison the mind of the child at its most impressionable age and make a lasting influence for evil upon those put under their care. Outside of the home there is no person who has so much to do with inculcating in young minds sentiments of virtue and honor as the teacher. The state is deeply interested in the moral training and education of all her children, and is vitally concerned that they shall be brought up under clean and good influences, so that they will grow into men and women with pure ideals and high aspirations. In the welfare and usefulness of the common school system every citizen of the state should be personally interested. Whatever hurts the system in one place in the state injures it in a more or less degree in all other parts of the state. It is a piece of machinery in which every individual in the state is a part. In its larger and broader sense, the state is the unit, as the doors of every public schoolhouse in the state stand wide open, and every child in the commonwealth is an invited guest. Any child within school years has the right to attend the public schools wherever he may be, and he is not limited to the place of his actual residence or domicile or to his district or county. And so any good citizen, in good faith and upon reasonable grounds to believe that what he writes or speaks is true, if free from malice or ill will and ac-

tuated solely by his interest in the common schools, may safely bring to the notice of those who hold any place as officials in the system any information that will enable them to perform with more efficiency their duties, and he will be protected as coming within the scope of qualified privilege, although the communication may be false as well as prima facie libelous. But if the person making the publication is prompted by actual malice or ill will towards the person concerning whom it is written or spoken, then the fact that it was believed to be true, or the fact that it was made in good faith, or the fact that it was made under circumstances that except for this notice would make it privileged, will not be allowed to save the person making the publication from the consequences of his act. When a person from malicious motives makes an attack upon the character of another, he puts himself beyond the protection that qualified privilege affords. Newell on Slander & Libel, p. 475; Cooley on Torts, p. 214; Townsend on Slander & Libel, sec. 208; Ranson v. West, 125 Ky. 457, 101 S. W. 885, 31 Ky. Law Rep. 82; Caldwell v. Story, 107 Ky. 10, 52 S. W. 850, 21 Ky. Law Rep. 599, 45 L. R. A. 735; Nix v. Caldwell, 81 Ky. 293, 50 Am. Rep. 163; Sharp v. Bowlar, 103 Ky. 282, 45 S. W. 90, 19 Ky. Law Rep. 2018; Stewart v. Hall, 83 Ky. 375; Edwards v. Kevil, 118 S. W. 273; Finley v. Steele, 159 Mo. 299, 60 S. W. 108, 52 L. R. A. 852.

But the plea of qualified privilege, as argued by counsel, does not present a question of law for the court. Of course, upon the pleadings, as well as upon the evidence, the court may rule in these, as well as other actions, that the plaintiff has failed to make out his case, or that the pleadings are not sufficient; but when the petition is sufficient, and there is any evi-

dence of actual malice or malice in fact, the case
should go to the jury. The only difference between
cases where qualified privilege is relied on and cases·
where the defense is a general denial or justification
is that where privilege is pleaded the burden of show-
ing actual malice is put upon the plaintiff. In other
cases, if the actionable matter is per se libelous, the
law will presume malice, and consequently it is not
necessary to a recovery that the plaintiff should show
actual malice in its publication. In other words, the
circumstances under which the publication was made,
if it is privileged, rebut the inference of malice that
under ordinary conditions would arise from such a
publication. As under this rule the burden of showing
actual malice was placed upon the plaintiff, it was of
course necessary that she should introduce some evi-
dence tending to show that the publication was in-
duced by malicious motives, and this we think she
sufficiently did to justify the court in letting the case
go to the jury.

Nor was it necessary that the plaintiff should in the
first instance introduce evidence to show the falsity
of the publication complained of. The law presumes
that every person has a good character, and this pre-
sumption is not overcome by the plea that the publi-
cation was privileged. This plea only rebuts the pre-
sumption of malice. It does not refute the presump-
tion of falsity. In Greenleaf on Evidence, vol. 2, sec.
419, it is said: "In ordinary cases under the general
issue the plaintiff will not be permitted to prove the
falsity of the charges made by the defendant either
to show malice or to enhance the damages, for his
innocence is presumed, unless the defendant seeks to
protect himself under color of the circumstances and
occasion of writing or speaking the words, in which

case it seems that evidence that the charge was false and that the defendant knew it to be so is admissible to rebut the defense.'' To the same effect is McIntyre v. Bransford, 17 S. W. 359, 13 Ky. Law Rep. 454. In this case, Tanner made two defenses: First, that the publication was privileged; and, second, that it was true. To avoid the first defense the plaintiff had only to prove that the publication was actuated by express malice. If it was, the privilege pleaded did not justify it, nor did the fact that Tanner was acting in good faith or upon reasonable information protect him. In other words, if Tanner was influenced by malice or ill will towards Miss Stevenson in writing the letter, he was guilty of actionable libel unless the publication was true. So that on the part of the plaintiff it was only necessary, in order to take the case to the jury and sustain a verdict to prove actual malice or malice in fact; and on the part of Tanner, to defeat a recovery, it was essential that he should establish either that the publication was true, or that it was made without malice and upon information that he in good faith believed to be true. This view of the law applicable to the case was given to the jury in the following instructions:

''No. 1. If the jury believe from the evidence that, in writing the letter of September 2, 1907, to J. H. Fuqua, and in imparting to said Fuqua by said letter the information therein contained with reference to the moral character of the plaintiff, the defendant was prompted by actual malice, that is, actual ill will or hatred on the part of the defendant toward plaintiff, or a reckless disregard of the plaintiff's rights by the defendant, the jury should, unless they believe as stated in the third instruction, find for the plaintiff, and fix the damages according to the fifth instruction.

"No. 2. If the jury believe from the evidence that, at the time the defendant wrote the letter mentioned in the first instruction, the defendant had received from sources which he believed to be reliable the information contained in said letter with reference to the moral character of the plaintiff, and if they believe from the evidence that at the time the defendant wrote said letter and imparted by it the information therein contained with reference to the plaintiff's moral character, he believed that the statement contained in said letter with reference to her moral character was true; and if they further believe from the evidence that in writing said letter and imparting to Fuqua the information therein contained with reference to the plaintiff's moral character the defedant was prompted by a desire to protect the public schools of the county or state, the jury should find for the defendant, unless they believe as stated in the first instruction.

"No. 3. If the jury believe from the evidence that the defendant meant to state in the letter mentioned in the first instruction that the plaintiff's reputation in Clark county for moral character was not good, and if they further believe from the evidence that at the time said letter was written it was true that the plaintiff's reputation in Clark county was that of being immoral in her conduct with men, the jury should find for the defendant.

"No. 4. 'Reputation,' as used in the third instruction, means the estimate which the community has of the person's character, while 'moral character' related to what a man or a woman actually is morally.

"No. 5. If the jury find for the plaintiff, they should fix the damage at such a sum as they may believe from the evidence will fairly and reasonably compen-

sate the plaintiff for the injury, if any, that the jury may believe from the evidence resulted to the plaintiff's business or profession of teacher and to her reputation and character by reason of the writing in the letter mentioned in the first instruction of the statements therein contained with reference to the moral character of the plaintiff, and for any humiliation and mental distress suffered by plaintiff by reason of same; and, if the jury find for the plaintiff, they may in their discretion allow her, in addition to the compensatory damages above defined, such further sum by way of punitive damages as the jury may deem proper under all the circumstances introduced in evidence; but, if any damages are allowed the plaintiff, the total should not exceed $20,000, the amount claimed by the plaintiff in the petition.''

Perceiving no error in the judgment, it is affirmed.