Karen COMPTON, Executrix
of the Estate of Lyle G.
Robey, Appellant,

v.

Jerry L. ROMANS and Dale
L. Romans, Appellees.

No. 92–SC–566–DG.

Supreme Court of Kentucky.

Nov. 24, 1993.

Rehearing Denied Feb. 24, 1994.

James A. Shuffett, Lexington, for appellant.

Eugene L. Mosley, William J. Nold, Miller, Mosley, Claire & Townes, Louisville, for appellees.

Mark D. Guilfoyle, Kevin J. Hable, Frankfort, for amicus curiae.

LAMBERT, Justice.

We revisit the rule of absolute immunity for high-ranking governmental officials who are found to have committed libel with malice or in reckless disregard for the truth when such arises out of the performance of their statutory duties; thereby denying citizens recovery of damages for injury to their good names and reputations. This Court has long recognized the desirability of granting certain high-ranking officials absolute immunity, not as an emolument or perquisite of office or for their personal protection, but to prevent timid, weak and vacillating performance of public duties and likewise prevent undesirable utilization of time and energy in the defense of litigation. *McAlister & Co. v. Jenkins*, 214 Ky. 802, 284 S.W. 88 (1926). Manifestly, the issue here results in a clash of public and private interests and the choice of one may destroy the other.

On Derby Day, May 7, 1988, in the first race at Churchill Downs, according to the program, there was entered a horse named Briarwood. This horse won the race. Thereafter, racing officials learned that the winner's name was actually Blairwood. It was also discovered that information in the Daily Racing Form for the previous day failed to report some of its previous races and timed workouts. While the pedigree of the horse identified as Briarwood was correct for Blairwood, significant wagering information was omitted. On race day, a $20,000 bet was placed on the horse, but was withdrawn before the race began.

Suspecting that a "ringer" had been entered in the competition or that some other rules violation had occurred, the racing stewards and the State Racing Commission began an investigation. Several days into the investigation but prior to its completion, appellant's decedent, Lyle G. Robey, Chairman of the Kentucky State Racing Commission, issued a press release which is the basis of this litigation. After informal consultation with Racing Commission members and others, but prior to any formal Commission action, Robey released to the press a statement, in part, as follows:

> From our initial investigation we have determined that there is probable cause to believe that the trainer Jerry Romans, his assistant trainer Dale Romans, the owner David Hall and the entry clerk Leo Reherman have violated the following Rules of Racing as promulgated by the Kentucky State Racing Commission:
>
> (1) that the horse was entered and raced under a name other than the name which is currently registered with the Jockey Club in New York.
>
> (2) that the correct identity of the horse and correct name were known and such information concealed from the officials of Churchill Downs, Kentucky State Racing Commission and the public.
>
> (3) that false and misleading statements have been made to the stewards and to the Kentucky State Racing Commission in the course of the investigation.

In addition to the foregoing, the release detailed existing safeguards designed to prevent misidentification of competing horses and acknowledged that the safeguards had failed. It further stated that the participation of various investigative and law enforcement agencies had been solicited and indicated a determination to discover the identity of wrongdoers and prosecute them. The tenor of the release was designed to reassure the public of the integrity of thoroughbred racing in Kentucky.

For purposes of this review and in view of our disposition, the result of the investigation is irrelevant. At trial, the court excluded all evidence and exhibits developed in the subsequent investigation and hearings before the Racing Commission and informed the jury that it was to decide the case based upon the knowledge and actions of the parties until the time of the press release, but not thereafter. The propriety of this ruling has not been challenged in this Court.

Robey sought a directed verdict on grounds of absolute immunity. His motion was denied. The trial court submitted the case to the jury under instructions which authorized a verdict for appellees if it found from the evidence that the defamatory material was substantially untrue, harmful to their reputations in the community, and communicated with knowledge that it was false or with reckless disregard as to its truth or falsity. Under this instruction, typically characterized as a qualified immunity instruction, the jury found for appellees and awarded each of them $25,000 in compensatory damages. Judgment was entered upon the jury verdict.

Robey sought relief in the Court of Appeals contending that as head of a state executive department with quasi-judicial authority and as a result of his actions in such capacity, he was entitled to absolute immunity from his defamatory statements. The Court of Appeals recognized that absolute immunity is generally limited to legislative and judicial proceedings, matters of military affairs, and to heads of state executive departments acting in discharge of duties imposed by law. See *Lanier v. Higgins*, Ky. App., 623 S.W.2d 914 (1981); *Tanner v. Stevenson*, 138 Ky. 578, 128 S.W. 878 (1910); and *Ranson v. West*, 125 Ky. 457, 101 S.W.

885 (1907). It also recognized that administrative bodies in exercise of quasi-judicial powers imposed upon them by statute may also have absolute immunity. However, it strictly limited such immunity to the administrative official's necessary duties and denied it in circumstances where the official's communication was not necessary to discharge statutory duties.

Affirming the trial court's refusal to grant Robey absolute immunity, the Court of Appeals noted that while all members of the Racing Commission are gubernatorial appointees, the Chairman is elected by other Commission members and is without any greater statutory authority than other commissioners. It concluded that "Robey's position was fundamentally different from other top Cabinet-level positions that have been afforded absolute privileges. The Chairman simply does not have such broad-ranging responsibilities." It also expressed the view that the press release and all the matters contained therein were not necessary to the discharge of any official duties; that while distribution of the information to certain officials might have been appropriate, distribution to the public was not. This Court granted discretionary review to examine the reach of the doctrine of absolute immunity and whether it is applicable to the chairman of a state regulatory commission upon whom has been imposed broad responsibilities with respect to industry and public protection.

It has long been settled Kentucky law that absolute immunity from defamation actions is available to certain governmental officials with respect to matters upon which the law requires them to act. Applying this principle, the Court in *McAlister & Co. v. Jenkins,* 214 Ky. 802, 284 S.W. 88 (1926), granted absolute immunity to an official communication of the Kentucky Real Estate Commission, even though the defamatory portion was beyond the scope of the decision. The rule announced by the Court was that "the absolute privilege applies whenever the communication is made in discharge of a duty under express authority of law by or to the heads of executive departments, provided the libelous communication is pertinent to the inquiry under investigation at the time." *Id.*

284 S.W. at 91. Despite the rule announced, the court recognized the practical difficulty of formulating a bright-line rule and the necessity for allowing public officials discretion in the manner in which their duties are discharged. The extent to which the *McAlister* Court would apply the rule it announced may be discovered in its eloquently stated reasons for its existence. We quote at length from *McAlister:*

It is true that the class of absolutely privileged communications are comparatively few, and that the courts have evinced a purpose not to extend that class, and yet, in sound reason and logic, it cannot be said it should not apply to a public official upon whom there is imposed a specific duty by law to act in a given matter. The imposing of such duty presumably authorizes him to act with perfect freedom and without fear of personal consequences. If in the discharge of a duty imposed by law a public official clothed with quasi judicial powers may have suspended over his head continually the threat of libel suits, it is apparent that his official conduct would be tempered by and tainted with the fear that he might be unjustly subjected to such actions. The policy of the law is therefore, and the reason of the rule is, that, although upon rare occasions judges and other public officials upon whom are imposed by law judicial or quasi judicial duties may maliciously slander or calumniate in the exercise of their authority, it is better that they should be protected upon such occasions by this absolute privilege than that the great body of such officials in the conscientious exercise of their duties should be hampered continually by the threat of such civil actions. Obviously one discharging such duties, except for such exemption, might perform them in a timid, time-serving, or inefficient manner. It is a rule therefore of public policy, not designed to protect the malicious official from the consequences of his wrongful act, but to protect the whole public from weak and vacillating public service by those upon whom such duties are imposed by law.

*McAlister,* 284 S.W. at 90–91.

From the foregoing quotation, there is no doubt that the *McAlister* Court sought to

promote a public policy which favored courageous and decisive performance of quasi-judicial authority, and by necessary implication executive action as well, unhampered by the fear of lawsuits. In so doing, the Court recognized that on occasion, the result would be protection of officials in their misconduct, but regarded this as a necessary price to pay for sound public policy. To determine the extent to which a public official shall have protection of the doctrine of absolute immunity, it is necessary to examine the lawful authority including such discretionary authority as may be reasonably implied, and the action taken which gives rise to the defamation claim.

■ The General Assembly created the Kentucky State Racing Commission. KRS 230.210 *et seq.* The Commission was granted "forceful control of thoroughbred racing" and "plenary power to prescribe rules, regulations and conditions" for such racing and wagering thereon. The Commission was directed to regulate thoroughbred race meetings "free of any corrupt, incompetent, dishonest or unprincipled" practices and to regulate such racing "so as to dissipate any cloud of association with the undesirable and maintain the appearance as well as the fact of complete honesty and integrity" of thoroughbred racing in Kentucky. See KRS 230.215(2). To facilitate implementation and fulfillment of the statutory purpose, the State Racing Commission was given broad rule-making, enforcement and adjudicatory authority.

We regard it as beyond reasonable dispute that a primary purpose for the existence of the Racing Commission is to assure the probity of every aspect of the enterprise. *Kentucky State Racing Com. v. Fuller*, Ky., 481 S.W.2d 298 (1972). One can scarcely conceive of a broader statutory grant of regulatory authority. As such, it is of no significance that the Racing Commission is not a cabinet-level department of state government. With respect to thoroughbred racing, its status as an independent agency of state government (KRS 230.220(1)) and the composition of its membership by gubernatorial appointment renders it fully comparable to a cabinet-level department for the purpose of immunity analysis. Moreover, by virtue of the statute which requires the Commission to designate one of its members as Chairman (KRS 230.220(1)), we conclude that the person so designated is of a comparable rank to the executive head of a department of state government.

■ Next we must examine Robey's actions to determine whether the press release was sufficiently connected to the discharge of his official duties to justify absolute immunity. At the outset, we observe that the trial judge determined as a matter of law that the actions taken by the Commission Chairman were in his official capacity. The Court of Appeals implicitly agreed, but denied immunity on the ground that the communication was not necessary for fulfillment of statutory duties. However, it recognized that some statement with respect to the pendency of an investigation would have been appropriate.

To resolve this issue, it is necessary to briefly return to the facts. At the time of release of the defamatory statement, it was undisputed that a misidentified horse trained by appellees had been entered in the first race at Churchill Downs on May 7, 1988. By virtue of this fact, the race result and the ensuing investigation, which included interviews with numerous individuals including appellees, the attention of the public had been drawn to the incident. At a meeting between the Racing Commission Chairman, the senior racing steward and others, it was concluded that the horse was indeed misidentified; that by virtue of readily available means of correct identification, and by apparently improbable statements made by appellees during the investigation, there was probable cause to believe that appellees were guilty of rules violations. The press release reflected the foregoing. While we do not question the jury verdict which found knowledge of falsity or reckless disregard of truth or falsity, the undisputed facts brought the controversy within the jurisdiction of the Racing Commission and it cannot be said that issuance of an explanatory statement was beyond the discretion of the Racing Commission Chairman. Perhaps the Court of Appeals was correct that the press release was not "truly necessary for fulfillment of

Robey's responsibilities." Perhaps the release was premature and injudicious. Nevertheless, the statement was clearly within the general scope of his statutory duties and "pertinent to the inquiry under investigation at the time." *McAlister*, 284 S.W. at 91. As such, it was protected by the doctrine of absolute immunity.

A public official or public body vested with broad regulatory powers must have considerable discretion in the manner of performance of duties imposed by law. This was recognized by the Supreme Court of the United States in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), with respect to the issuance of press releases relating to departmental personnel action:

> We think that under these circumstances a publicly expressed statement of the position of the agency head, announcing personnel action which he planned to take in reference to the charges so widely disseminated to the public, was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively. It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty. That petitioner was not required by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policy-making rank, for the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.

*Id.* at 574, 79 S.Ct. at 1341, 3 L.Ed.2d at 1443. To say in retrospect that a different course of action would have been preferable is simply to acknowledge that hindsight is 20/20. Quoting Judge Learned Hand in *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir.N.Y. 1949), the *Barr* Court noted that if it were possible in practice to allow defamation judgments only against the guilty, it would be unconscionable to deny recovery. It recognized, however, that:

> It is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith.

*Barr, supra,* (quoting *Gregoire v. Biddle,* 177 F.2d at 581). Unless courts grant the immunity at issue here to officials found to be guilty of defamation, the policy sought to be promoted will have been defeated.

At the time of the press release, the integrity of thoroughbred racing in Kentucky was in question. The Chairman of the Racing Commission, upon whom rested primary responsibility to eliminate the cloud, determined that an explanatory press release was in order and after consultation with other Commission members, prepared and issued the release. While it was later determined that the statement contained materially false information, regardless of whether this was by design or by recklessness, for the public interest and protection of all such public officials in the performance of their duties, the principle of absolute immunity must be upheld. While we intend no comfort for those public officials who may despicably defame their fellow citizens, the public interest in the unflinching enforcement of the law must prevail over the private interest of a wronged citizen. *Tanner v. Stevenson,* 138 Ky. 578, 128 S.W. 878 (1910).

For the foregoing reasons, we reverse the Court of Appeals and remand to the trial court for entry of a judgment of dismissal at appellees' cost.

STEPHENS, C.J., and REYNOLDS and SPAIN, JJ., concur.

LEIBSON, J., dissents by separate opinion in which COMBS and WINTERSHEIMER, JJ., join.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

Lyle Robey, then Chairman of the State Racing Commission, made statements in a press release which have been proved false and to have been made with reckless disregard for the truth. These statements libeled Jerry and Dale Romans in their occupations. The Majority weaves a blanket of "absolute immunity" to protect Robey from having to answer for his wrongdoing, claiming this is necessary to serve some important governmental interest. But the interest to be served by this immunity is negligible, and the opportunity thus afforded to officeholders to abuse private citizens with reckless, publicity-seeking accusations is far too great to be tolerated in a democratic society properly concerned with protecting the rights of its citizens.

Our Kentucky Constitution provides in pertinent part:

"Every person may freely and fully speak, write and print on any subject, *being responsible for the abuse of that liberty.*" Ky.Const., Sec. 8. [Emphasis added.]

Our decision relieves the Chairman of the State Racing Commission from "being responsible for the abuse of that liberty."

Way back in 1910 our Court *rejected* the notion that a public school superintendent had an absolute privilege simply because of her official capacity to libel the "good moral character" of an applicant for a state teaching certificate who intended to teach in her county. *Tanner v. Stevenson,* 138 Ky. 578, 128 S.W. 878 (1910). We upheld a libel judgment for $5,000 in that case: "The cases to which this privilege applies are few in number and ought not to be enlarged." *Id.* 128 S.W. at 881.

In case after case over the last 100 years our judicial opinions have recognized that our founding fathers intended for our Kentucky Constitution to protect individual rights against governmental abuse. See, for example, *Tabler v. Wallace,* Ky., 704 S.W.2d 179, 183–84 (1985), quoting constitutional debates.

In the present case the Majority states: "While we intend no comfort for those public officials who may despicably defame their fellow citizens, the public interest in the unflinching enforcement of the law must prevail over the private interest of a wronged citizen."

The relationship between Lyle Robey's press release and "the public interest in the unflinching enforcement of the law" is attenuated at best. No statute specifies the Chairman of the State Racing Commission *shall* issue press releases, even about matters of public concern that fall under the duties of the Commission to investigate and to adjudicate. On the contrary, if Robey had a duty here, it was to refrain from reckless accusations and to await the outcome of the investigation before making press accusations that the Romans were guilty of telling lies and concealing information. This case is substantially identical to *Lanier v. Higgins,* Ky.App., 623 S.W.2d 914 (1981), wherein the Kentucky Court of Appeals reached an *opposite* conclusion, and our Court denied further review. Just as (in *Lanier*) no specific duty compelled the City of Louisville Chief of Police to accuse a police officer of being "perhaps the worst racist in the Louisville Division of Police" during a television interview "about race relations within the police department," *Id.* at 914, here no duty compelled Robey to accuse the Romans in the press.

The Majority cites *McAlister & Co. v. Jenkins,* 214 Ky. 802, 284 S.W. 88 (1926), as controlling authority in this case. I agree. Unfortunately, *McAlister* calls for the *opposite* result from that we reached in this Majority Opinion. *McAlister* does not provide carte blanche (or "absolute") immunity to public officials making public pronouncements in an official capacity. It specifies *limited circumstances* in which such officials are protected, *none* of which apply here:

"... the cases to which this immunity from liability applies are confined to judicial and legislative proceedings, matters involving military affairs, and communications made in the discharge of a duty under express

authority of law by or to heads of executive departments of the state." 284 S.W. at 90.

While it holds that the exception for communications made in the course of "judicial and legislative proceedings" extends to the "quasi-judicial" act of administrative bodies, specifically the Kentucky Real Estate Commission, it further holds this protection applies *only* to the official report of the investigation and findings of the Real Estate Commission:

> "Here we have an administrative body charged with the exercise of quasi judicial powers and the duty imposed · upon its membership to take certain action after exercising those quasi judicial functions, and the very reason for the rule requires they should be exempt from such actions." *Id.* [284 S.W.] at 91.

Further, *McAlister* holds immunity applies to the official reports and findings of an administrative body *only* upon a further finding that the part of its report which was allegedly libelous was "pertinent to the inquiry." *Id.* There is *nothing* in *McAlister* sanctioning the Real Estate Commission to engage in press releases, let alone to do so with immunity.

When *McAlister* turns to the remaining exception to the rule of liability for false and defamatory statements, which applies to statements by "heads of executive departments of the state," it holds absolute immunity would *not apply* to the members of the Real Estate Commission. Therefore, it would also not apply to the members and Chairman of the Racing Commission in the present case who are in exactly the same position. The "Commissioner" of the Kentucky State Racing Commission is simply "a member" "designate[d]" by the other members to preside. KRS 230.220(1). He has no special statutory status or duties in addition to those assigned to the Commission.

As expressed in *Restatement (Second) of Torts*, Sec. 591(B), absolute immunity of public officials to publish defamatory material extends only to "a Governor or other superior executive officer of state." The definition of executive department is limited by KRS 12.010(2) to the highest level of state government:

> " 'Department' means the basic unit of administrative organization of state government, by whatever name called, . . . . "

KRS 230.010, *et seq.*, does not designate the Kentucky State Racing Commission as a "department." Robey was not head of ·an executive department of government by any stretch of the imagination. The Racing Commission is established by statute as "an independent · agency of state government," KRS 230.220(1), no different in character from the Kentucky Real Estate Commission. It is simply an "administrative body" under KRS 12.010(8), and as such, its Chairman and members have no greater authority to publish a libel than that assigned to the Kentucky Real Estate Commission in the *McAlister* case.

Judge Wilhoit's Opinion in *Lanier v. Higgins, supra,* cogently expresses the legal principles which apply here. It describes the limited nature of the immunity enjoyed by a public official when speaking to the news media about a matter within his jurisdiction, as follows:

> "Applying the case law to the appeal before us, it is obvious that at the time he made the alleged defamatory statements Chief Higgins was not the head of an executive department of the state nor was he engaged in a judicial or legislative proceeding or in military affairs. He was not involved in a quasi-judicial proceeding, the statements were not communicated to another officer in the course of the performance of their similar duties, nor was the communication made in the discharge of a statutory duty. The appellant's brief does show that the Policy and Procedure Manual of the Louisville Division of Police provides that a commanding officer has 'the authority as well as the responsibility to respond directly to legitimate news inquiries about operations of his command.' This is not the equivalent of a statutory duty to answer news inquiries, although it does make it clear that, at the time Chief Higgins was being interviewed, he was engaged in the performance of official duties. Under the circumstances, and in view of the foregoing case law, we believe that

Chief Higgins was not clothed with an absolute privilege but rather with a special or conditional privilege. *See* also *Restatement (Second) of Torts,* Sec. 598A (1977)." 623 S.W.2d at 915–16.

Here the trial court's analysis of the law of libel as it applies to this case was sound in every respect. The trial court recognized that Commissioner Robey did not qualify for absolute immunity as the head of an executive department of state government, nor was he protected from liability by the immunity extended to communications in the course of judicial or quasi-judicial proceedings. Commissioner Robey, as did Chief of Police Higgins, both speaking to the news media in an official capacity, enjoyed a "qualified" or "conditional" immunity. This immunity is the legal equivalent of that extended to members of the press reporting on a public figure, as we discussed at length in *Ball v. E.W. Scripps,* Ky., 801 S.W.2d 684 (1990), only without the special requirements on standards of proof imposed by the U.S. Supreme Court to protect freedom of the press under the First Amendment. This is a limited immunity from liability for a defamatory statement: one which does not extend to "misstatements of fact made 'with actual malice' or 'with reckless disregard of whether it [the misstatement] was false or not.'" *Id.* at 689, citing *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The Majority does not challenge the sufficiency of evidence to support the jury's findings in this respect. Thus the Majority Opinion accepts the fact these two professionals earning their living in the horse racing business, trainer Jerry Romans and assistant trainer Dale Romans, were libeled in their occupations by Robey's statements they "concealed from the officials of Churchill Downs" the "correct identity of the horse," and that they made "false and misleading statements ... to the stewards and to the Kentucky State Racing Commission in the course of the investigation." Yet we deny redress for this wrong, citing the *McAlister* case which is *qualitatively different* from this one and sets out rules calling for the opposite result. The Majority Opinion greatly expands the reach of absolute immunity.

I recognize that the protection afforded by the laws of libel to our citizens against the abuse of governmental officials has already been somewhat eroded by the U.S. Supreme Court in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), but this applies *only* where the officials speak for the *federal* government. There is no need to extend this oppressive regime to state and local government officials other than the Governor and heads of executive departments who speak for the Governor. There is no reason to believe *Barr v. Matteo* produces benefits that merit its use to protect the defamatory statements of less important state and local officials. We should reject this notion in favor of the position taken by Judge Wilhoit in the *Lanier* case:

"The public certainly has an interest that officials of government be entitled to exercise their duties unembarrassed by the fear of damage suits arising from acts done in the course of those duties.... At the same time, the public also has interests that officials act responsibly, that they furnish it with accurate information, and that the good reputations of citizens not be damages wrongfully. *At least until now, the case law in this jurisdiction* has found the latter interests to be more compelling in a case such as we have here." 623 S.W.2d at 916. [Emphasis added.]

Judge Wilhoit qualifies his Opinion by stating we have protected our citizens "at least until now." We now choose the opposite course, and I disagree. We should not abandon our citizens to defamation in the press simply because the speaker is a public official speaking under the pretext of keeping the public informed. A qualified or conditional privilege as described in *Lanier v. Higgins,* requiring proof of actual malice or reckless disregard for the truth, is all that is needed to balance public interest and private rights. This was the law in Kentucky until now. This was the law as the trial court defined it. We should affirm.

SARAH COMBS and
WINTERSHEIMER, JJ., join.